IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


VERIZON PENNSYLVANIA, INC., et al.     :        CIVIL ACTION
                                            :
                   v.                      :
                                            :
PENNSYLVANIA PUBLIC UTILITY        :
COMMISSION., et al.                 :        No. 08-CV-3436


MEMORANDUM AND ORDER

Ditter, J.                                                      May  26 , 2011

       This case is essentially an appeal from a state regulatory agency's interpretation of federal

regulations issued under the Telecommunications Act of 1996.  Plaintiffs, Verizon Pennsylvania,

Inc. and Verizon North, Inc. (hereinafter "Verizon"), have filed a motion for summary judgment

on Count I of their complaint.  In Count I, Verizon challenges the Pennsylvania Public Utility

Commission's ("PUC")[1] interpretation of federal regulations that control Verizon's obligations to

provide access to wire centers at a reduced cost in order to promote competition among providers

of telephone services.  The defendants and defendant-intervenors have responded.  A reply and

sur-reply have also been filed.  For the reasons that follow, Verizon's motion for summary

judgment is GRANTED.

    I. The Telecommunications Act of 1996

       Central to the resolution of this motion is the Telecommunications Act of 1996 ("Act"),

legislation enacted by Congress to break the monopoly telephone companies had over local

---

[1] The PUC includes defendant Commissioners Cawley, Pizzingrilli, Christ, Gardner, and Powelson, collectively.

telephone service.  Under the Act, incumbent local exchange carriers, like Verizon, are required

to allow a competitive local exchange carrier to connect its equipment to their existing network.

This permits the competitive carrier to compete without having to bear the full costs of building

its own telecommunications network.

The Federal Communications Commission ("FCC") promulgated regulations to

implement the Act that require companies like Verizon to provide various network elements to

its competitors at a low, regulated rate.  47 U.S.C. § 251 (2005) (the best rate is known as

"TELRIC").[2]  This obligation is referred to as "unbundling,"[3] and it requires incumbent providers

like Verizon to "interconnect with and [] rent parts of their networks to new entrants – especially

those parts of a local network that it is least economic for a new entrant to duplicate."  *Bellsouth*

*Telecomm., Inc. v. Ky. Pub. Serv. Comm'n*, 693 F. Supp. 2d 703, 705-6 (E.D. Ky. Feb. 22, 2010)

(quoting *Qwest Corp. v. Pub. Utils. Comm'n of Colorado*, 479 F.3d 1184, 1187 (10th Cir. 2007).

"Unbundling" of network elements, and those unbundled network elements, are referred to as

"UNEs."

Two types of incumbent provider facilities that are required to be made available as

UNEs in certain locations are "transport" and high capacity "loops."  In this case, "transport"

refers to those facilities that carry traffic between Verizon wire centers.  "Loops" refer to those

facilities that carry traffic from an end-user's premises to a switch of the serving carrier's

network.  FCC regulations set the standard for making impairment and unbundling

---

[2] The state utility commissions, here the PUC, are empowered, but not required, to review and approve these interconnection agreements to ensure compliance with federal law.

[3] The terms, "bundled" and "unbundling" as used here have no connection with the courtship requirements imposed by Pennsylvania Country Dutch parents during the 19th century.

determinations.  *See* 47 U.S.C. § 251(d)(2); *United States v. Telecomm. Ass'n v. FCC*, 359 F.3d

554, 565-58 (D.C. Cir. 2004), *cert. denied*, 542 U.S. 925 (2004) ("*USTA II*").

Verizon is only required to unbundle those network elements for which, among other

requirements, the "failure to provide access to such network elements would impair" the ability

of other carriers to provide competitive service and cannot be forced to unbundle where those

standards are not met.  47 U.S.C. § 251(d)(2)(B).  If there is presently sufficient competition so a

wire center is not impaired, unbundling is not required.

    II.  Factual and Procedural Background[4]

A Competitive Fiber Provider ("CFP") is an independent company unaffiliated with an

incumbent local exchange carrier like Verizon.  Its business is the leasing of dark fiber transport

to competitive carriers as an alternative to those competitive carriers using their own or

Verizon's fiber transport.  Verizon makes space available to the CFP in its wire center and

charges the CFP pursuant to its tariff for using the space.  As a wholesale provider of fiber

capacity, a  CFP may bring into a Verizon wire center (through the wire center cable vault), a

high capacity, fiber-optic cable with a minimum of 72 and a maximum of 432 dark fiber strands

for distribution to other competitive carriers.

    A competitive carrier that leases from a CFP must have its own collocation arrangement

in the wire center that includes active electrical power and optronics equipment capable of

lighting the dark fiber strands it is obtaining.

As a result of certain technology that is unique to Verizon, a CFP can access a shared

---

[4] For all practical purposes, I have used and quoted verbatim from the parties' joint stipulation of undisputed facts for my description of the mechanics and equipment that create the question in this case.

alternate splice point near the wire center cable vault for the purpose of terminating CFP fiber facilities at the terminal for distribution via CAT Terminal ("CAT") collocation arrangements.[5] This arrangement permits the competitive carrier to lease dark fiber strands within a CFP's fiber-optic cable. Those strands become dedicated to the competitive carrier. Using its own optronics equipment in its collocation arrangement, the competitive carrier lights the dark fiber strands that it has leased, and in that way transmits telephone or data traffic into and out of the wire center.

A competitive carrier may lease dark fiber that comes from the CFP as its only fiber-based transport leaving the wire center. It is also possible for a competitive carrier to lease dark fiber from the CFP and also to have a separate fiber facility from its collocation leaving the wire center, where, for example, the facilities leased from the CFP were used to provide survivability or over-flow capacity.

As stated in the tariff, a competitive carrier that leases dark fiber strands from a CFP is not responsible for supplying, installing, and maintaining the CFP's fiber-optic cable from the

---

[5] Verizon's FCC tariff provides the rates, terms, and conditions under which a CFP may bring its fiber-optic cable into a Verizon wire center to lease dark fiber strands within the cable to other carriers that are collocated in the wire center. The rates, terms, and conditions associated within Verizon's CAT Terminal offering are set forth in Verizon Telephone Companies Tariff F.C.C. No. 1, Section 19.10.3. (*Joint Stipulation*; Exhibit A).

Collocation can be either physical or virtual. Physical collocation is "an offering by an incumbent [local exchange carrier] that enables a requesting telecommunications carrier to:
  (1) Place its own equipment to be used for interconnection or access to unbundled network elements within or upon an incumbent [local exchange carrier]'s premises;
  (2) Use such equipment to interconnect with an incumbent [local exchange carrier]'s network facilities for the transmission and routing of telephone exchange service, exchange access service, or both, or to gain access to an incumbent {local exchange carrier]'s unbundled network elements for the provision of a telecommunications service;
  (3) Enter those premises, subject to reasonable terms and conditions, to install, maintain, and repair equipment necessary for interconnection or access to unbundled elements; and
  (4) Obtain reasonable amounts of space in an incumbent [local exchange carrier]'s premises, as provided in this part, for the equipment necessary for interconnection or access to unbundled elements, allocated on a first-come, first-served basis.

47 C.F.R. § 51.5.

CAT to the wire center cable vault (i.e., the exit of the wire center).

The dispute in this case arises from proceedings before the PUC. In 2006, a group of competitive local exchange carriers petitioned the PUC to review and pre-approve for their use a list of wire centers Verizon had listed as exempt from the unbundling requirements of the FCC regulations. The competitive carriers challenged Verizon's interpretation of the FCC regulations definition of "fiber-based collocator."[6] The PUC declined this pre-certification request, but suggested the parties attempt to mediate the disputed issues with the guidance of PUC staff members in an attempt to avoid litigation. In September, 2007, with the mediation efforts stalled, the competitive carriers filed a petition seeking PUC intervention through the PUC's "material question" procedure. 52 Pa. Code § 5.302. This procedure provides for the PUC to answer hypothetical questions about the application of FCC rules.

Availing themselves of this procedure, the competitive carriers asked the PUC to interpret the FCC's regulatory definition of a fiber-based collocator as a carrier that operates a fiber-optic cable or comparable transmission facility. The competitive carriers also asked the PUC to find that neither a CAT collocation arrangement leased out by Verizon nor a collocation arrangement of any carrier obtaining services through a CAT should be counted for purposes of determining

---

[6] The federal regulations define a *fiber-based collocator* as:

[A]ny carrier, unaffiliated with the incumbent [local exchange carrier], that maintains a collocation arrangement in an incumbent [local exchange carrier] wire center, with active electrical power supply, and operates a fiber-optic cable or comparable transmission facility that
    (1) Terminates at a collocation arrangement within the wire center;
    (2) Leaves the incumbent [local exchange carrier] wire center premises; and
    (3) Is owned by a party other than the incumbent [local exchange carrier] or any affiliate of the incumbent [local exchange carrier]s except as set forth in this paragraph. Two or more affiliated fiber-based collocators in a single wire center shall collectively be counted as a single fiber-based collocator.

47 C.F.R. § 51.5.

whether a wire center was impaired. In other words, that neither the CAT nor the competitive carriers to which it leases fiber should be counted.

Verizon asked the PUC to find that a CAT and any unaffiliated competitive carrier that leases a portion of the fiber-optic cable pursuant to a CAT fiber termination agreement, be counted as separate, fiber-based collocators for purposes of determining whether a wire center was impaired.

The PUC determined that the CAT provider satisfied the criteria for a fiber-based collocator, but any competitive carriers that connect to that provider's cable did not.

In part, Verizon contests the PUC's determination. Verizon contends that a CAT fiber termination agreement is specifically identified in the FCC's order issuing its regulations as a qualified form of fiber-based collocation, and therefore, the PUC erred when it determined that such an arrangement does not qualify.[7] Moreover, Verizon asserts that the PUC erred in finding that a competitive carrier that leases dark fiber from another competitive carrier should not be counted as a fiber-based collocator even though the same dark fiber collocation arrangement with an incumbent carrier would be counted.

Consistent with its contention that in determining whether certain of its Pennsylvania wire centers qualified for an exemption or not, Verizon counted the CAT and any competitive carrier(s) that leased dedicated dark fiber strands located on the CAT as separate fiber-based collocators. For the purposes of this case, Verizon has identified two Pennsylvania wire centers

---

[7] Based on its interpretation of the FCC's regulations at 47 C.F.R. §§ 51.5 and 51.319(e)(3), Verizon took the position that 53 of its wire centers in Pennsylvania are either Tier 1 or Tier 2 wire centers (as those terms are used in the FCC regulations), and therefore, are exempt from certain transport unbundling. Verizon also contends that 47 C.F.R. §§ 51.5 and 51.319(a)(4) and (5), exempt three of the 53 wire centers from unbundling DS1 loops and four wire centers are exempt from unbundling for DS3 loops. The PUC and the competitive local exchange carriers disagree.

– WKBGPWK (Wilkinsburg) and TRCKPACT (Turtle Creek) – as wire centers that would be downgraded to Tier 3 status under the FCC regulations as interpreted by the PUC. Tier 3 status would require Verizon to unbundle DS1, DS3, and dark fiber transport on all routes connecting to these wire centers and there would be no exemption for unbundling transport out of them.[8]

III. Standard of review

Although the present motion is for summary judgment on Count I of the complaint, the parties agree that this action is more akin to appellate review. In this instance, there are no specific factual findings to review because no hearing was held. Thus, I shall conduct a *de novo* review of the PUC orders to determine whether, as a matter of law, they are consistent with the 1996 Act and applicable FCC regulations. *See MCI Telecomm, Corp. v. Bell Atl-Pa.,* 271 F.3d 491, 517 (3d Cir. 2001).

IV. Discussion

At issue is whether a competitive carrier that has collocated equipment in a Verizon wire center and accesses through the CAT Terminal dark fiber strands within a CFP's fiber-optic cable is a fiber-based collocator as the FCC defines the term.[9] As set forth above, the PUC determined that they were not. I look to the federal statutory and regulatory scheme of the Act to resolve this dispute.

A. The Triennial Report and Remand Order

To aid in the implementation of the Act, the FCC promulgated rules set forth in the

---

[8] These facilities were identified for purpose of establishing a case in controversy for this litigation.

[9] Dark fiber is "fiber within an existing fiber optic cable that has not yet been activated through optronics to render it capable of carrying communications services." 47 C.F.R. § 51.319(a)(6)(I). It is uncontested that fiber-optic cable contains numerous strands of fiber.

*Triennial Report and Remand Order*, 20 F.C.C. Rcd. 2533 (2005) ("*TRRO*"). In the *TRRO*, the

FCC established numeric thresholds for the designation of impaired or not impaired.[10] These

rules set objective measures for when the number of business lines and fiber-based collocators in

an individual wire center would be deemed sufficiently competitive so the wire center would not

be impaired and thus a competing carrier would not have access to Verizon's facilities. Access

in this context means whether Verizon must lease to the competing carriers its high capacity

wires running to and from the wire center on an unbundled basis at a reduced rate.

The *TRRO* also defines fiber-based collocation simply – "as a competitive carrier

collocation arrangement, with active power supply, that has a non-incumbent [local exchange

carrier] fiber-optic cable that both terminates at the collocation facility and leaves the wire

center." *TRRO*, 20 F.C.C. Rcd. at 2533, ¶ 102. Collocation occurs when a competing carrier

installs its own equipment inside an incumbent local exchange carrier's wire center. The *TRRO*

specifically approves collocation arrangements such as "Verizon's CATT fiber termination

arrangements." *Id.*

When a company has collocation facilities connected to fiber transmission facilities

---

[10] Competitive local exchange carriers are not impaired, and an incumbent local exchange carrier is not required to unbundle network elements, where a wire center contains:

(1) DS1 loops with at least 60,000 business lines and 4 fiber-based collocators.
(2) DS3 loops with at least 38,000 business lines and at least 4 fiber based collocators.
(3) DS1 dedicated transport where the wire centers at each end of the route are both Tier 1 wire centers (containing at least 38,000 business lines or 4 or more unaffiliated fiber-based collocators) or Tier 2 wire centers (containing at least 24,000 business lines or 3 or more unaffiliated fiber-based collocators).
(4) DS3 dedicated transport or dark fiber transport where the wire centers at each end of the route are either Tier 1 wire centers or Tier 2 wire centers.

*See TRRO*, 20 F.C.C. Rcd 2533, ¶ 5.

obtained on an indefeasible right of use (IRU) basis from another carrier, including the incumbent local exchange carrier, these facilities shall be counted for purposes of this analysis and shall be treated as non-incumbent local exchange carrier fiber facilities. *Id.*, at 2594 n. 292 (citing *Triennial Review Order*, 18 F.C.C. Rcd. 17231-32, ¶ 408 & nn.1263, 1265). Briefly stated, a fiber-based collocation exists when a competing carrier installs its own equipment enabling its fiber to originate in and leave an incumbent's wire center. If it has an indefeasible right to do so, it shall be counted as a non-incumbent local exchange carrier.

### 1. Leasing dark fiber from a competitive carrier

It is undisputed that 47 C.F.R. § 51.5 provides that a competing carrier leasing dark fiber from Verizon is counted for the purposes of determining whether a wire center is impaired or not. There is no reason why leasing dark fiber from a competitive provider should be counted differently than that leased from Verizon. The same sort of capital investment is made by the competitor that leases and lights the dark fiber for the use of its customers regardless of which entity makes the dark fiber available.

The regulatory definition of a fiber-based collocator provides that the fiber must be "owned by a party other than the incumbent LEC or any affiliate of the incumbent LEC." 47 C.F.R. 51.5. The only additional requirement is that the dark fiber be obtained on an indefeasible right of use.[11] That requirement is met in this case.[12] Thus, I conclude that under the plain

---

[11] Indefeasible right of use is defined as "an exclusive, long-term lease, granted by an entity holding legal title to a telecommunications cable or network, off a specified portion of a telecommunications cable, such as fiber optic strands within an optical fiver cable." *Ansari v. Qwest Communs. Corp.*, 414 F.3d 1214, 1215 (10th Cir. 2005).

[12] The contract submitted by the intervening defendants as Appendix G shows that competitors are leasing dark fiber from other competitors through indefeasible right of use arrangements. As noted by Verizon, such arrangements are consistent with what I would expect from sophisticated carriers and reflect their efforts to protect their investments and contractual obligations to their customer.

meaning of the regulation, if the competitive fiber provider that operates the CAT and the competitive carrier that leases dark fiber pursuant to the CAT arrangement are not affiliated, both entities should be counted as fiber-based collocators.

2. Operation of a fiber-optic cable or comparable transmission facility

I have also considered whether the competitive carrier collocation arrangements here constitute the operation of a fiber-optic cable or a comparable transmission facility, as these terms are not defined in the regulations.[13]

Central to the defendant's view of this issue is its assertion that the FCC is quantifying the financial investment of the collocator as the method of determining impairment. Defendants contend anything short of full ownership of fiber-optic cable is an insufficient investment to establish the wire center's lack of impairment. But ownership is not required as the regulations clearly contemplate competitive carriers' *operation* of fiber-optic cable as a measure of a wire center's impairment.

Based on a dictionary definition of the term "operates," "the regulations would seem to require some level of control or management over the fiber-optic cable or facility in question in order for a [competing local exchange carrier] to qualify as a [fiber-based collocator]." *See Indiana Bell Tel. Co. v. Hardy*, 618 F. Supp. 2d 936, 939 (S.D. Ind. 2009)(citing *The Oxford Dictionary*). What is a sufficient amount of control?

Some district courts that have considered this issue would require activity such as

---

[13] To interpret a statute or regulation, I look to its plain meaning and, if the language is clear and unambiguous, the inquiry is over. If the language is ambiguous, I consider the statutory purpose or legislative history. A provision is ambiguous only where the language in dispute is "reasonably susceptible of different interpretations." *Dobrek v. Phelan*, 419 F.3d 259, 264 (3d Cir. 2005).

"surveillance of the integrity of the system, respond[ing] to trouble reports, and undertak[ing] routine maintenance." *Id.* at 940 (quoting *Mich. Bell Tel. Co. v. Lark*, 06-12374, 2007 U.S. Dist. LEXIS 33826 at *6 (E.D. Mich. May 8, 2007)). In those cases, if the cross-connecting competitive carrier did not have the ability to control the network system's operation or speed, to "light" or activate the fiber, and to maintain the network, the host competitive local exchange carrier remained the operator. I agree that a competitive carrier that does not perform any of these functions is not operating a system.

But that is not the case here. As stipulated by the parties, the competitive carrier leases and lights its own fiber optic strands from within the CFP's fiber-optic cable. However, the competitive carrier is not responsible for supplying, installing, and maintaining the CFP's fiber-optic cable from the CAT terminal to the wire center cable vault (i.e., the exit of the wire center). Thus, the question is whether leasing and lighting fiber-optic strands available through a CAT agreement is sufficient control to find that the competitive local exchange carrier *operates* a fiber-optic cable system under the Act. I find that it is. The competitive carrier not only decides and implements its use of its leased fibers, but has installed the necessary connecting and lighting equipment so it can do so.

As noted by the district court in *Illinois Bell Telephone Co. v. Box*, 2008 U.S. Dist. LEXIS 61355 (N.D. Ill. Aug. 2008), "Verizon's CATT fiber termination arrangement is distinguishable from cross-connected collocators" because competitive carriers "that cross-connect to the purchaser of the CATT service would still be required to light, or activate, fiber optic using their own optronics equipment." *Id.* at *37. The cross-connected collocators in Illinois were required to purchase already lit, or activated fiber capacity from the fiber-based

11

collocator.  *Id*. at 37-38.   But that is not the case here.

A review of the *TRRO* supports the Verizon's view that the FCC considers a carrier that is leasing dark fiber and deciding what and when it will be lit is operating that fiber.  The record before the FCC revealed that

> carriers are capable of activating dark fiber when they have aggregated sufficient revenues from traffic to justify the deployment of extensive optronics, but even at such revenue levels, sometimes carriers have not achieved sufficient revenues to justify the high expense of fiber deployment.

*TRRO* ¶ 134.  The FCC found that "dark fiber allows for very efficient use of facilities" and that "competing carriers using unbundled dark fiber transport can operate more efficiently than when using lit transport, because the competing carrier itself engineers and controls the network capabilities of transmission and can maximize the use of previously dormant fiber."  *Id.* at ¶ 135.

The FCC's stated goal is increasing competition and encouraging facilities deployment, and that goal is promoted when a competitive carrier invests in its own optronics to "light" dark fiber.  *Id*. at ¶ 157 n.496.  I agree with the Illinois district court that "[t]his demonstrates that in determining impairment, the FCC values an individual [competitive local exchange carrier's] deployment and "lighting of its own *fiber*, rather than merely the purchasing of an already lit facility."  *Box*, 2008 U.S. Dist. LEXIS 61355 at 38-39 n.8.  Thus, I conclude that a competitive local exchange carrier that leases dark fiber from a CFP through a CAT collocation arrangement, with the ability to light or not light what it has leased, operates a fiber-optic cable or comparable transmission facility within the meaning of 47 C.F.R. § 51.5.

It follows that in determining whether a wire center is impaired or not, both the CFP and the competitive local exchange carrier to which it leases fiber are operators as defined by the Act

12

and thus should be counted when determining whether a wire center is impaired.

An appropriate order follows.